Mr. Doherty. May it please the court. My name is John Doherty. I'm here for the City of Pittsburgh. Okay, I've got some questions about the procedural status of this case. Because I understand that after the preliminary injunction was issued, there was a contempt hearing. And as a result of the contempt hearing, Judge Convy ruled from the bench articulating an obligation for the city to agree with Norfolk and Southern on effective interim remedial measures to pay late fees if once the remedial measures were defined it did not immediately comply with them and to pay Norfolk and Southern's attorney's fees associated with the contempt motion. That it was a modification basically, although she didn't say the state of the previous order, but the docket describes it as modifying the previous order granting preliminary injunctive relief. I've got some, and I gather that's true, the order of March 21st. Before you answer that question, did you intend to reserve some time for rebuttal? Yes, I would like to reserve three minutes. Okay. Your Honor, as I have read the record, because I did not begin work with the City of Pittsburgh until August of this year, my understanding is that the two methods set forth and that are subject to the original or initial hearing and direction of the court were later determined to be insufficient to accomplish the goal that was set in place by the injunction. As a result of time, best I can tell from the record, the parties went back to court. Norfolk went in under a method of civil contempt, and the city set forth at that period of time that it was not acting in contempt, but it was acting prudently in trying to accomplish the goal, the goal being to act efficiently, economically, and to accomplish the method of protection. I have talked with the engineer, and as it has been explained to me, the two methods set forth in the original injunction hearing were conceptual in nature. Following the hearing and before the contempt, they began to implement the studies that would be necessary to accomplish the work. They determined that in no particular order, first conception being movement of the street would not be efficient or effective because the method they had proposed and the data that they had collected would mean it would not work, so in essence it would be a waste of effort and economic resource. The second element, which has been referred to the erection of a retaining wall, it was explained to me that the data collected indicated that the initial information used to develop the conceptual idea was insufficient and that the plan, although in conception was a good idea, would not be implemented because it would not work, and it had to be reevaluated. And following the contempt hearing, my predecessor and Mr. Rhodes, I believe, then worked on a third alternative is how I will phrase it, which is what is in fact going on now as we speak. But that third alternative is different from the order that's on appeal here, is it not? I don't think it is for this reason. If I have to implement the first or the second conceptual idea, which is in this order, then effectively the court would be directing me to not utilize my constituents' resources effectively. I would be told or being forced to implement an idea that wouldn't work. Simply stated, there's a two-inch hole in the dike and somebody said stick your finger in it, I think it will work. Well, my finger is only an inch. I still have water that's coming out. But the court didn't tell me two fingers, it only told me one. So as I was able to determine, the parties agreed to meet and to confer, and they then came up with the plan that is being implemented. Is the city objecting to this plan? I mean, you didn't appeal the plan. You didn't appeal the order imposing the plan. We believe that the plan that is being implemented is, in fact, what the court directed us to do at the initial injunction. So it's a relation back in that we are complying with the directive of the initial injunctive relief granted Norfolk. We have appealed the initial injunctive relief that was granted to Norfolk. Why? I've said two things, which are you asking me why? Why have you appealed it? We believe that the court has committed two errors, an error in the application of Pennsylvania law, as well as an error in the ultimate decision that a remedial effort was required of the city. And by way of a very simple explanation, which I think will be illustrated for me as I go through the argument, Corfu Street would be, if we may turn to the bench for a moment, what sits behind you would be referred to as the West End Overlook. That sits above Corfu Street, constructed roughly in 1962. Corfu Street, which is the level upon which you sit, is a bench in a hillside, almost like steps. You're in the middle layer. Three members of the court are somewhat similar to the three private property owners, the Medina, the Williams, and the Blairs. The court tip staff sitting in front of you would be the equivalent of the bench upon which the Norfolk Southern Lines run. The lines appear to have been put in place shortly after the Civil War, roughly 1865. Corfu Street itself appears to have been noticed by way of document in 1898. We can confirm a construction of a street in roughly 1903. The land upon which you sit is moving. The subject of the hearing was it's somebody's responsibility, but a key portion of the hearing is why is it moving? And Norfolk's expert has said this is a unique position. This is a unique landslide. It's unlike any other landslide. And he has said, in very simple terms, this is a landmass that was created back in the Paleostean era and has remained dormant since that period of time. Historically speaking, as I've indicated, the building has, or the location of people and streets and railroads has occurred, but nothing moved until the first landslide that is identified by Norfolk Southern. But are you still objecting to the third? Yes. It's being effectuated. Yes. How far are you in, but you're working on what's required. We are working on what's required because the court has told us if we don't complete it, we're subject to two things. Number one, an ongoing directive to complete it, i.e., the injunction that sits before this court, and escalating fines or contributions to the Norfolk effort. You know, it would have been helpful to us as a court to have this description of this third order and what's going on in our understanding of the case. I can appreciate it now that I'm standing here making the argument, but at the time I step into this matter, I pick up a directive to appeal and to file my briefs. So I don't use it as an excuse, but it is the facts. We believe that the implementation that is now occurring is what's on appeal. Is it your position that the appeal covers the third remedial order? Correct, because we went into court under a directive to you're not doing anything, which was a motion to contempt. There was no finding of contempt. We explained to the court below that if you force us to implement this plan, these two conceptual ideas, always proposed as conceptual ideas, you will be forcing us to take an effort that's not going to work. And the court's directive to go back to Norfolk and develop a plan appears to be an agreement or an acknowledgment of the court below that we will not require you to do conceptual idea number one and number two, but we do require you to comply with the directive of the order, and that is do something to stop a landslide or a potential. You're at least not now appealing that you're being forced to do something that won't work, because you agree that what is being done will work, but you should not be forced to do it? Correct. We believe that this is the best plan, and in conjunction with Norfolk participating in the plan and giving us their agreement to continue to move forward. Now, the order does hold that once we identify work is complete, they may return and look to make sure that it has been complied with. I take that to mean when you build a home, after the contractor says, I'm finished, you go through with your list and say, okay, there's a refrigerator, there's steps, there's doors, there's fixtures, there's water pipes, there's faucets, et cetera. So we believe that the appeal from the original order of Judge Conte is what's on appeal. The remedial effort is an agreed-upon relation back. I use the term relation back. The remedial effort is an agreement upon it. So why do you think you shouldn't be doing this in the first place? Well, we believe we shouldn't be doing it, as I indicated, for two reasons. First, in either order, there's no duty on the part of the city alone to take this action. The expert utilized by Norfolk has indicated. Mr. Giordi. Yes. In light of the questions, I'm going to add an additional five minutes to your time. Thank you, Your Honor. I appreciate it. I'll add five minutes to the Norfolk Southern time as soon as I need it. In light of the expert's testimony, he has indicated that the unique nature of this slide is due to conduct. We don't know by whom, and in some cases, there will be statutes to protect. But in simple words, he had said, on your level of the bench, there was a bowl. The bowl collected water, and the water would be allowed to drain naturally. At some point in time, that bowl became filled, and it didn't operate as its natural event. Went on to say beyond that that his feeling was there was fill added, there's private property owners that sit at or about the bowl, and there's something that sits above you upon which work was performed. All of that conduct is relevant to this. They have asked for a mandatory injunctive relief, which, in effect, puts the ultimate conclusion of the case as the remedy. The city, in effect, entered a fight and had to stand there with its hands behind its back because it couldn't raise any of these defenses. So when the court below says it appears reasonable to presume that Norfolk would achieve its goal on the negligence claim, I disagree wholeheartedly and say that I don't think Norfolk would be able to achieve that goal. And if we get into the negligence, we have to apply the Tort Claims Act because we are entitled to certain set-off. We are entitled to certain limitation upon the liability that we owe. But doesn't the Tort Claim Act, the Pennsylvania Tort Claim Act, accept negligence in the maintenance of property? They can proceed under negligence of maintenance of property, but they are limited by the act. Now, I've also indicated case law in my brief, which says, under the common law for any landowner in Pennsylvania, there is no right of recovery in certain circumstances. We believe that this would be one. Therefore, if there has never been an acknowledgment of a common law right to proceed, then Norfolk would be precluded from proceeding against the city under that theory because first thing in order to apply the act is there must be a common law right of recovery. If there's no common law right, we don't even go to the act. If you are notifying that your property is being negligently maintained and if it is not maintained, it's going to cause damage to the down-the-hill property owner, is that not a recognized tort claim under the common law and is not a nuisance claim the same type of negligent maintenance of property that will cause an invasion of water or soil upon the underlying property? In response to your question, in plural, I think the overwhelming answer is no to all, to break them down. Notice in and of itself does not arise to a duty. It just simply places you on notice. Was this claim raised before the district court, the common law claim? Which part of common law? The one that you're citing right now. The cases have been cited. The city has always taken the position that the act applies. We've always taken the position that we should be permitted to set forth the fact that there are other parties who may be responsible. These are all defenses. These are all gleaned from the briefs filed by my predecessor, and they are contained in the cases cited by either the city, the court, or the opponent. But wasn't it the position of the district court that, okay, there may be other parties involved, but there is mud and dirt and rocks coming down this hill, and what needs to be done immediately is an injunction forcing you to stabilize it, and then you can go after other people if they cause the problem, but somebody needs to step in now and protect the public and the railroad. Well, I agree and disagree in part with your recitation. I agree that they directed somebody to step in. I disagree with the remaining elements for this reason. The property that was falling was the city street, but it was property behind pushing it off. The property behind is owned by someone else. Notice in and of itself, again, is not an imposition of liability. As far as the danger or the alleged danger, I think that the district court opinion contains one conclusion that says they're speculative, they can be anticipated to a certain extent, but they're too remote in order to apply a nuisance stance. A derailment is speculative. Land and rocks coming down is not speculative. The mere fact that land and rocks fall down in and of itself does not cause a danger. If that were the case, then I think the Commonwealth as an entity, the city as an entity, and every municipality within this Commonwealth would then be imposed upon with a duty to constantly monitor hillsides. We would not have development. We would not have the placement of roads. Route 28 here in this county is a classic example of something that occurs on a yearly basis. Rains come in the spring, and it falls. But in order to develop this community, whether it's the urban city, the suburban areas that surround it, and now the suburban areas are developing into a self-sustaining development of their own. If you place that duty upon the municipalities, I think you're going to be imposing a severe restriction on the natural development and the progression of society as it grows and as the Commonwealth and the municipalities within it provide for its citizenry. So the mere fact that things fall off of a hillside in and of itself should not be a danger. It's what can we anticipate once we know they fall. Rocks fall from hillsides probably on a regular basis. If we look along the roads that we drive, we can see the debris as it piles on the side of the road. It's when the debris becomes of such a nature that it interferes. Cases that are cited in the brief talk about that, when you start to interfere with the travel of the roadway. In this particular case, Norfolk's own expert has said that he would not tell them or direct them not to proceed and that he believes with appropriate monitoring and the placement of their flag man that they can operate as they anticipate. Thank you, Mr. Dougherty. We'll have you back. I come from a very flat state. Mr. Rhodes. May it please the Court, my name is Greg Rhodes. I'm with the law firm of Buchanan, Ingersoll, and Rooney. I'm here on behalf of Norfolk Southern Railway Company. For the clarity of the record, at the time of the proceedings in the district court, I was with the law firm of Klett, Rooney, Lieber, and Schorling. That firm now as a result of a merger is Buchanan, Ingersoll, and Rooney. I'd like to start by clarifying a few of the things that Mr. Dougherty said, especially in connection with Judge Ross' question at the beginning. I was at the contempt hearing. The contempt hearing was a result of what Norfolk Southern considered to be no activity at all on behalf of the city after the injunction was entered in August of 2005. At that contempt hearing, the court did in fact find that the city had failed to comply with her order, and that is in the order in question. It did set a list of fines for the city if it did not begin to comply with her order. At that time, it was not the case, as Mr. Dougherty represented, that the city said that what she had recommended, actually what their own expert had recommended as interim measures wouldn't work. Instead, what the city said was that they didn't want to have to act twice. They didn't want to have to undertake interim measures at this point in time and then more measures as a result of a trial, and they preferred to simply do a permanent fix of the hillside at this point in time. And since Norfolk Southern doesn't care how it's remediated, so long as it is remediated, we had no objection to that. So that's essentially how the current order is in place and why the city is doing what it is now. It's not that what the court ordered in its August 31, 2005 order wasn't of any value. In fact, it was, but those were more in the nature of interim measures, which is essentially what preliminary injunctive relief is designed to accomplish. Again, it was the city's idea and the city's request to alter the court's order to allow them to do something more than what the court had previously requested that they do. Do you consider the altered order to be the order on appeal before us now? If it's not, it wasn't appealed. It was not appealed. I think that the original order is the only thing before you here today. The fact that the city has chosen to do the court's agreement, the city has decided to do something else to comply with that order, is satisfactory to Norfolk Southern and we have no objection to that. Does that make this issue moot? I think it does. I think that once that order was changed, I think there is an argument that makes it moot. I haven't made that argument. I can see the converse of that. Was your brief filed before or after the date that that order was entered? My brief was filed after the date that that order was entered and I did not make that argument. And I will say that... Then you waive mootness. I have not made the argument of mootness on behalf of Norfolk Southern. I will say that. The city has made an argument here today that it's not just its property that's causing the problem, it's the property of the land owners. Whether there's any basis for that argument or not, the fact remains that the rocks and other material that are coming down on our tracks are all coming from the city's property. It's the city's property... Is that in the record? That is the record. It's done on the record. All four witnesses who testified at the hearing, including the city's own geotechnical expert, all testified that the rocks and the debris and actually the asphalt from the city street itself, they're all coming from the city's property. Norfolk Southern filed a claim against the city and our injunctive relief was properly addressed to the city. Whether the city thinks that other parties, including other land owners or insurance companies or contractors or architects, if it wants to bring all of those parties into the lawsuit and ultimately determine responsibility for the cost of the fix, that's fine. But what's before the district court in connection with the injunctive relief is to have somebody fix the problem so that the dangers will be lessened. Mr. Rhodes, would you agree with the proposition that although you're not, at this stage, seeking monetary damages from the city in the complaint, at least what's remaining in the complaint, would you at least agree with the proposition that if the real estate exception to the Pennsylvania Political Subdivisions Towards Claims Act did not apply in this case, that you would not be able to bring this action? No, Your Honor. I do not agree with that. If you don't agree with that, why would you still be able to bring this action? First of all, the Political Subdivisions Towards Claims Act only applies to actions for damages. It has no prohibitions against injunctive relief against the city of Pittsburgh. So that's number one. Number two, even if... Now, wouldn't that destroy the jurisdiction of the federal court if that were the case? I don't know that, Your Honor. I do know that in addition to that argument, the other argument is that nuisances are not... Isn't this a diversity action? It is a diversity action. So, I mean, that's, you can sue for common law tort in a diversity case, right? That's true, although injunctive relief, you measure, my recollection is you measure whether the matter satisfies the amount of controversy by the approximate amount or more. So your argument is that since this is a... put aside the monetary issue for a second. Your argument is that since this is an action for an injunction, that the Political Subdivisions Towards Claims Act does not apply. Correct. Period. So we don't need to worry about the real estate exception. We do not. Okay. In response to Mr. Dougherty's argument about rocks come down hillsides all the time, first of all, the record in this case is clear that this is not a situation where a random rock comes down every now and then. This is a situation where in a 13-month period, 11 landslides with more than 1,700 tons of rock came down onto the railroad tracks. And in connection with that, in terms of the harm that resulted, there was a derailment. Seven cars of a train on May 6, 2004, did derail as a result of being struck by a landslide. On another occasion, a worker trying to clean rocks from a landslide was, in fact, struck in the head by another rock coming off of the hillside. The District Court's finding of fact that there is a presently existing actual threat of personal and perhaps deadly injury to Norfolk Southern's employees both operating the train and maintaining the tracks was far from speculative. In fact, it was based on actual events that had occurred in the time period in question. But if this is the reactivation of a prehistoric land mudslide, landslide, through no cause or fault of the city, why should the city be responsible for it? Isn't this a naturally evolving event that the city didn't cause? And can the city be held responsible if there is no causation found? And the District Court seemed to think that even absent a final causation, that the city should go ahead with the repairs. If we were complaining about a single landslide for which there was no causation, that might be a good argument. But Pennsylvania law is clear that when a landowner with notice of a deadly condition on its property receives that notice, it then has an obligation to act to protect adjoining landowners. Even if the landowner is in no fault in causing the problem? The fact that there is a serious and potentially deadly condition on your property places an obligation on you, the city, just like any other landowner, to rectify that situation to protect adjoining landowners. That's the law set forth in Bayless and McCarthy and other cases. It's a basic restatement position, Section 364. And the only exception to that in the restatement is an old distinction between natural and artificial conditions. However, that distinction is no longer recognized in Pennsylvania. There are Superior Court cases to that effect, including Barker v. Brown, 1975. This Court, the Third Circuit in 1984 in the McGar v. United States case, reviewed that area of the law entirely and not only agreed that the Superior Court had repeatedly rejected any distinction between natural and artificial, but it also projected that the Pennsylvania Supreme Court, based on the actions of many other states, 14 at the time, there have been more states that have joined that trend at this point, they all reject the natural versus artificial distinction. Again, to answer your question, before the city has any notice that there is a reactivation of a prehistoric land site, I would agree with you. They don't have an obligation to go out on a regular basis and decide whether this property is just going to reactivate and fall. That's not what we're claiming. The argument here is that with notice of a deadly condition on your property, you as a Pennsylvania landowner have a fundamental obligation and duty to correct that problem. If you fail that duty, that is in and of itself negligence. Also remember, the injury here, with regard to causation, the injury here is not a rock falling on a person's head. The injury here is having to operate with the threat of more landslides. It's the city's failure to comply with its own duty, which is causing that injury, that irreparable harm, to occur at this point in time. So we do have a duty, we have a failure of that duty and negligence, we have causation, and we have an injury. We have a presently existing threat of deadly harm to Norfolk Southern's employees. Can public nuisance include a trespass? Public nuisance can include a trespass. This is not a trespass. A nuisance is distinguished from a trespass in the nature of the interference with another party's property rights. Here the interference is with our safe enjoyment and use of our property. They're not interfering with our possession of that property. A trespass is an interference with the possession of that property. The public nuisance complaint, though, that count was dismissed by Judge Conte. It was. Do you have anything else, Mr. Rhodes? No. We gave you some additional time in case you needed it, but we thank you. Thank you. Mr. Doherty? Yes, Your Honor. To address a couple of the points raised by Mr. Rhodes, once we begin to talk of causation, we apply Pennsylvania law. I disagree with Mr. Rhodes' interpretation, and I've set that forth in the main thrust of my argument. I also disagree with Mr. Rhodes' discussion concerning the duties and obligations of the natural cause versus the artificial cause, and specifically when the court looks at the cases that arise under that scenario, they all relate to trees and the ability to observe a tree and the ability and what the tree does when it falls into the roadway or what the tree does when it falls onto the neighbor. We're dealing here with a naturally occurring landmass that has been reactivated by something, and when you're looking to impose the duty on the landowner, as I said in the first part of my argument, landowner in Pennsylvania consists of the private individual, the commonwealth, and the various municipalities. What is the duty going to be? What would fulfill or not fulfill the duty? And when we step back in the bigger picture and look at this, this is an injunctive proceeding, and Mr. Rhodes' damages are all monetary. We do not give monetary injunctions when they can be reduced to monetary damage. But there are a number of cases holding irreparable harm as a threat to human life and safety. Well, it can be. My life in jeopardy, I would think that would be irreparable harm. It is to you, and I think that that is where a court that sits at an appellate level is much different than a court that sits at a local district level or a common police court if we look to the commonwealth. The loss of life is important and certainly is tragic when it occurs. But in the bigger circumstances of what we have here, the loss of life would appear to be no different than traveling on a train track and being involved in an accident, having an airplane fall from the sky. Gravity does what it does. Planes fall and they do crash, but we don't stop flying. And in this particular case, Norfolk's workmen always stand risk of injury when you are working on a hillside or below a hillside, whether it is a natural hillside or one that has been changed by man to accommodate a road, to accommodate a housing structure, to accommodate a railroad. So that risk is always there. It's not significant to this particular case. The risk of a train being struck in a landslide, always there if we're going to decide and we are going to operate next to naturally occurring hillsides. Or in the alternative, we're going to excavate and use technology in order to place roads and thoroughfares and railroads in a place where that event can occur. And I think it is likely to presume that it could always occur. Therefore, it doesn't make it irreparable in this particular instance. Even though there were 11 landslides and Norfolk Southern found it necessary to post a flagman at that location 24 hours a day? Even though in what circumstance? In light of the whole argument, even though there were 11 landslides? You're saying under the facts? No, I think the reason I would disagree with your statement and say Norfolk's own expert has come forward and said, with all of the facts known at the date and at the time he testified, that he believed operations of the trains could continue and he did not tell Norfolk to stop. Yeah, but they have the flagman there, don't they? Well, he had indicated with the flagman that that would be an appropriate method to continue the operation of the train and he would continue to be retained and would always investigate whatever schedule Norfolk had him. When we look at those circumstances, this is and always is a money-damaged case. And in cases where money is the ultimate recovery, those are matters that are not and should not be ripe for an injunction and should proceed. If we have a question about the speed in which we proceed, then this court can vacate the injunction and direct it back to the district court with an explicit direction that they are to proceed as quickly as possible to bring all of the parties in so all of the issues can be argued. And the district court has that right as well when the matter is initially filed in front of them, that if they believe that it's monetary, that they're concerned about what could occur, then they always have the right to expedite a full and complete trial when each and every party would get the opportunity to present its evidence and to either defend itself or to show that there are others that are responsible and may be more responsible. Mr. Rose is not arguing mootness, but he expresses opinions that this appeal is perhaps moot to the fact that the original order is no longer being enforced and that it's a modified order. I gather your position on mootness is that the appeal is not moot? I certainly would argue that it's not moot. And I also state and suggest that when you seek injunctive relief, you are in a court of equity, and equity is a court of fairness. It does not appear prudent for a branch of government to impose upon another branch of government the directive to execute a task which has been identified as inefficient and is not cost-effective. And when I raise cost-effectiveness, I must now also raise what is put forth in the brief and was identified by the court below. The city of Pittsburgh operates under two guidance principles right now. One is Act 47, and the other is Act 11, or ICA. So it has a monetary difficulty, to say the least, and it has overseers who will look at and must approve the budgets as well. So the city is now placed in a position where it is, and it has a duty to cooperate within the Commonwealth with the ICA and the Act 47, and it's also being forced by the federal court to cooperate and to respond. And the constituents of the city of Pittsburgh are the ones who are most harmed under the circumstances because they have a situation where their government is not in a fiscal good being or well being. It's being forced to spend. And what Mr. Rhodes says, well, we didn't like the first idea or second idea. Why accomplish a job if you know the job is not going to work? Is the fiscal condition of the city of Pittsburgh a matter of record in this case? Yes, it is. It was recognized by the district court in the magistrate judge's recommendation. It is identified, and it is also identified before Judge Conte when we go in and the remediation effort, or as Norfolk says, lack of effort, becomes an issue that must be discussed and addressed. So as I said, I think it is in the court's equitable power to say if the conceptual ideas are not going to be efficient, then you can proceed forward. And if Norfolk has a question of if this would go back in some way, shape, or form, well, we only wanted to pay for this type of method and you enhanced it or gave betterment, again, we're dealing with monetary issues at that time, and the monetary issues can be distinguished by the court alone. Thank you, Mr. Gordy. We thank both counsel for an excellent job in their arguments and we'll take the matter under advisement. Thank you.